**FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAR 1 9 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Norwest Bank Wisconsin, National
Association, a Wisconsin Banking
Corporation, as Trustee,

       Plaintiff,

v

The Malachi Corporation, Inc.,

       Defendant.

_____/

Case No. 99-40146

Hon. Paul V. Gadola
  U.S. District Judge
Hon. Virginia Morgan
  U.S. Magistrate Judge

*I hereby certify that the foregoing is a true copy of the original on file in this Office. CLERK, U.S. DISTRICT COURT EASTERN DISTRICT OF MICHIGAN By _____ Deputy Clerk Dated 3/17/08*

### STIPULATION TO ENTRY OF ORDER ON MOTION OF YEO & YEO, P.C., FOR ENTRY OF AMENDED ORDER APPOINTING YEO & YEO, P.C., AS RECEIVER

Yeo & Yeo, P.C., Receiver; Norwest Bank Wisconsin, National Association,

Trustee/Plaintiff; and HP/Management Group, Inc., by their respective attorneys, stipulate

to entry of the Order on Motion of Yeo & Yeo, P.C., for entry of Amended Order Appointing

Yeo & Yeo, P.C., in the form attached hereto.

                WINEGARDEN, HALEY,
                LINDHOLM & ROBERTSON, P.L.C.
                Attorneys for Yeo & Yeo, P.C., Receiver

Dated: March 13, 2008
                /s/ L. David Lawson
                L. David Lawson (P32998)
                G-9460 S. Saginaw St., Suite A
                Grand Blanc, MI 48439
                (810) 579-3600
                (810) 579-1748 Fax
                DLawson@winegarden-law.com

**08CV1602**
**JUDGE ZAGEL**
**MAGISTRATE JUDGE KEYS**

1

MILLER JOHNSON
Attorneys for HP Management Group, Inc.

Dated: March 12, 2008                    /s/ Boyd A. Henderson, with consent

Boyd A. Henderson (P14865)
250 Monroe Avenue, NW, Suite 800
P.O. Box 306
Grand Rapids, MI 49501
(616) 831-1700
(616) 988-1719 Fax
hendersonb@millerjohnson.com


PEPPER HAMILTON LLP
Attorneys for Wells Fargo Bank
Wisconsin. NA, Trustee

Dated: March 12,  2008                   By: /s/ Kay S. Kress, with consent
                                         Kay S. Kress, (P39339)
                                         100 Renaissance Center, Ste. 3600
                                         Detroit, MI 48423
                                         (313) 393-7365
                                         (313) 557-0656
                                         Kressk@pepperlaw.com


DORSEY & WHITNEY, LLP
Attorneys for Wells Fargo Bank
Wisconsin. NA, Trustee
Patrick McLaughlin
50 S. Sixth Street, Suite 1500
Minneapolis, MN  55402
(612) 340-2975

S:\MORGAN\99-40146 Norwest Bank WI v. Malachi Corp order.wpd

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Norwest Bank Wisconsin, National
Association, a Wisconsin Banking
Corporation, as Trustee,

       Plaintiff,

V

The Malachi Corporation, Inc.,

       Defendant.

_____/

Case No. 99-40146

Hon. Paul V. Gadola
U.S. District Judge
Magistrate Judge Virginia Morgan

## ORDER ON MOTION OF YEO & YEO, P.C., FOR ENTRY OF AMENDED ORDER APPOINTING YEO & YEO, P.C., AS RECEIVER

Yeo & Yeo, PC, filed a Motion for Entry of Amended Order Appointing Yeo & Yeo, P.C., as Receiver. The Motion was served: (a) upon all parties who have filed claims pursuant to the Order Approving Claims Procedure, dated April 7, 2000; (b) Wells Fargo Bank, Successor to Norwest Bank Wisconsin, N.A., as Trustee (the "Trustee") for all of the class of creditors who purchased revenue bonds (hereinafter the "Bondholders") issued in six separate transactions to finance the acquisition of seven nursing homes by the Malachi Corporation (c) counsel to parties who have filed appearances in the adversary proceedings captioned *Wells Fargo Bank v Health v Healthlink Services, LLC,* United States District Court for the Eastern District of Michigan, File No. 2:07-cv-10087, and *Wells Fargo Bank Wisconsin, Association, National Association, as Trustee v HP/Management Group, Inc., et al,* United States District Court for the Eastern District of Michigan, Southern

3

Division, File No. 03-40340, (hereinafter the "Adversary Proceedings"); and (d) creditors listed in the bankruptcy proceedings of Doric Corporation, fka The Malachi Corporation, US Bankruptcy Court for the Eastern District of Michigan, Case No. 01-63412 (which bankruptcy case was dismissed on June 4, 2002). The Motion was referred to Magistrate Judge Morgan pursuant to an Order of Reference, dated January 8, 2008 (Docket 507). The Court has considered the Responses to the Motion filed by Plaintiff Norwest Bank Wisconsin (nka Wells Fargo Bank National Association), Trustee, and HP/Management Group, Inc.; a Reply by the Receiver; and Additional Responses of the Trustee and HP/Management Group, Inc. The Motion having come on for hearing, it is Ordered as follows:

1.    Appointment and Property. Yeo & Yeo, P.C. is hereby reappointed as the Receiver for the six "Receivership Estates" of The Malachi Corporation described below and for all of the Property of The Malachi Corporation, Inc.'s facilities, as the term ("Property") is defined in paragraph 4 of this order:

> The Bay City Receivership Estate, holding proceeds from the operation or sale of the Bay Shores Nursing Center, aka Tri-City Nursing Center, 3254 East Midland Road, Bay City, Michigan 48706
>
> The Riverview Receivership Estate, holding proceeds from the operation or sale of the Marian Manor Nursing Care Center, 18591 Quarry Road, Riverview, Michigan 48192;
>
> The Redford Receivership Estate, holding proceeds from the operation or sale of the Cambridge West Nursing Care Center, 18633 Beech Daly, Redford, Michigan 48420;
>
> The Gillett-Wautoma Receivership Estate, holding proceeds from the operation or sale of the Gillett Nursing Home, 330 Robin Hood Lane, Gillett, Wisconsin 54124 and the Wautoma Care Center, 327 South Waupaca Street, Wautoma, Wisconsin 54982;

The Princeton Receivership Estate, holding proceeds from the operation or sale of the Sunnyview Village Health Care Center, 900 Sunnyview Lane, Princeton, Wisconsin 54968;

The Manitowoc Receivership Estate, holding proceeds from the operation or sale of the RiverBend Health & Rehabilitation Center, aka Manitowoc Health Care Services, South Rapids Road, Manitowoc, Wisconsin.

2.    Segregation and Distribution of Funds.  The Receiver shall continue to maintain six separate custodial accounts, one for each of the Receivership Estates; and a separate custodial account for funds not allocated to specific Receivership Estates by the Receiver.  The Receiver may establish these custodial accounts with Wells Fargo Bank, and the Receiver shall have the right and power to direct Wells Fargo Bank with respect to investment of the account proceeds, with a view to preserve and protect the account assets.  The separate funds of the Receivership Estates shall not be commingled for any reason, subject to the Receiver's ability to determine the correct allocation of cash amongst the Receivership Estates as provided below in this Order.  The Receiver may enter into Receivership Estate Custody Agreements with Wells Fargo Bank, NA, in the form attached to the Motion as Ex. D.

The Court entered an Order dated Feb. 21, 2006 (Docket #421), providing that the [prior] Receiver was to disburse to the Trustee from the Bay Shores Receivership Estate $3,000,000; to the Trustee from the Manitowoc Receivership Estate $2,000,000; and to the Trustee from the Princeton Receivership Estate $250,000.  That Order was recently affirmed on Appeal.  As a result of diversion of funds at issue in the litigation matters described above, there are not sufficient funds to make such distributions in full at this point in time; and if all of the funds being held by the Receiver were to be distributed, there would not be sufficient funds for the Receiver to act or perform its functions.  The following funds

shall be distributed to the Trustee in part performance of the Court's order, by March 31, 2008: to the Trustee for the Bay Shores Estate, $1,600,000; to the Trustee for the Manitowoc Estate, $625,000; and to the Trustee for the Princeton Estate, $250,000. Except to the extent of such payments, the Order dated Feb. 21, 2006 (Docket #421), is stayed pending further proceedings. Following expiration of the filing of post-filing claims, as provided herein, and/or as additional funds become available through allocation of unallocated funds or the liquidation of claims, the Trustee or the Receiver may apply to the Court for distributions pursuant to the Order dated Feb. 21, 2006 (Docket #421).

The Court entered an Order dated October 23, 2003 (Docket #308) granting the Trustee's Motion for Leave to Pursue Receivership Claims against HP/Management Group, Inc., and approving the funding of a litigation reserve from proceeds of the sale of certain nursing homes, including the home that was part of the Riverview Receivership Estate. One hundred forty-eight thousand dollars in sale proceeds from that nursing home were approved to fund the litigation reserve from the Riverview Receivership Estate, but no funds were received, because the home was not sold. In 2006, the Court approved a sale of the Riverview home for $25,000. Those sale proceeds are currently held by the Trustee. The Trustee is authorized to apply the sale proceeds to the litigation reserve authorized by the Court.

3.    Cooperation and Turnover of Records. HealthLink Services, LLC and all of its respective agents, principals, employees, affiliates, assignees or other parties who were actively engaged in concert and participation with HealthLink Services, LLC, while it served as Receiver in this matter, including Thomas Johnson and any attorneys acting on behalf of HealthLink Services, LLC, are ordered to deliver immediately to, or at the

6

direction of, the Receiver or the Receiver's agents, to the extent not already delivered, any books and records, pleadings and discovery in litigation matters, or other "Property" of the Receivership Estates, including electronically stored information or data, as defined below, and to fully cooperate with the Receiver. HP/Management Group, Inc., and all of its agents, principals, employees, affiliates, assignees or other parties who were actively engaged in concert and participation with HP/Management Group, Inc., while it served as manager under Long-Term Care Facility Management Agreements with the Receiver, HealthLink Services, LLC, including Douglas Mittleider, and any attorneys for HP/Management Group, Inc., are ordered to deliver immediately to, or at the direction of, the Receiver or the Receiver's agents any books and records, including electronically stored information or data, or other Property of the Receivership Estates, in their possession or control, and to fully cooperate with the Receiver.

4.   _Possession and Control of Assets._   The Receiver shall take possession, control and custody of all of the "Property" of the Receivership Estates, as the term Property is defined under USC § 541 of the Bankruptcy Code of 1978, including, without limit:

a.   Any and all cash on hand;

b.   All books and records;

c.   All accounts receivable;

d.   All choses in action;

e.   All payment intangibles;

f.   All claims arising out of and related to the performance of healthcare services;

7

g.     All income tax refunds; and

h.     Any claims arising under the Bond provided by Healthlink Services,

LLC, under the Order, dated April 9, 1999.

5.     <u>Substitution in Adversary Proceedings and Pursuit of Claim on Bond.</u>  The

Receiver  shall substitute in the place of the Trustee in the Adversary Proceedings,

including  defending  the  indemnification claim asserted  by  HP/Management Group,

Inc., against the prior Receiver.    The Receiver is given leave to take such action as

necessary, including instituting litigation, to pursue recovery on the bond of the former

Receiver, HealthLink Services, LLC, which shall also be considered an Adversary

Proceeding.  The Receiver will keep the Trustee advised of all material developments in

connection with the Adversary Proceedings, and the Receiver will not settle or compromise

any claim in the Adversary Proceeding without a motion to the Court seeking approval of

the settlement.

6.     <u>Use of Receivership Assets.</u>  The Receiver may not use, lend, disburse,

encumber or pledge any of the  receivership assets  except  as provided in this Order.

The Receiver may advance the ordinary and necessary expenses of prosecuting or

defending claims or matters raised in this action, and in the Adversary Proceedings and

other claims, including the employment of experts, investigators, credit information

services, process servers, court reporters, transcriptionists, and document copy services;

and any storage fees required for storage of records or assets of the Receivership.  The

Receiver shall not employ any other professional persons or entities, or any other

expenses, not described in this Order.  Any advances of the Receivership cash shall be

reported in the fee applications filed by the Receiver as described in paragraph 10.

8

7.      Reporting.  The Receiver shall file a monthly report of all cash balances, receipts and disbursements for each Receivership Facility by the 20th of each month for the proceeding month or months, beginning in April, 2008.

The monthly report shall be served upon counsel for Wells Fargo Bank for all Bondholders and upon any other party in interest filing a request.

8.      Claims.

A.      Pre-Filing Claims Procedure

This Court entered an Order Approving Claims Procedure on April 7, 2000 (Docket No. 118), providing for a procedure for filing claims by Creditors of the Defendant, or the nursing home Facilities, for debts incurred, in whole or in part, prior to March 31, 1999, the date of filing of this action. The Court's Second Amended Order Appointing Receiver (Docket No. 116), provides for payment from the respective Receivership Estates of funds to be made in an order of priority set forth therein, with first priority being costs and expenses of operating and maintaining each Facility on or after March 31, 1999, and receivership expenses, inter alia (since all of the nursing homes have been sold, there will be no further operating expenses); secondly, delinquent personal and real property taxes and assessments assessed or levied against each Facility; third, future personal property and real property taxes and assessments; and fourth, amounts due and payable to Plaintiff Norwest Bank under the Indenture Agreement, Loan Agreement, and Mortgage for each Facility. It appears from the Motion of the Receiver that there are not currently sufficient funds available to pay claimants that are included in the priority categories set forth in the Order entered at Docket No. 116; and there may not be sufficient funds to pay all of those claims in full. The claims procedures previously set forth

9

in the Order Approving Claims Procedure (Docket No. 118), is therefore Tolled, pending further Order of this Court after the Court has determined whether the Receivership Estates hold funds sufficient to pay claimants in addition to the those persons whose claims are entitled to priority under the Order entered at Docket No. 116, and the persons to be paid, and amounts of payment, to such claimants.

B.  Post-Filing Claims Procedure.

(1).  This Post-Filing Claims Procedure shall be applicable to all creditors with Claims against the Defendant, the Facilities, or the Receivership Estates for debts, fees, expenses, or costs incurred by or relating to the Facilities, the Defendant, the Receiver (or prior Receiver), and the Receivership Estates, in whole or in part, from and after March 31, 1999, or which are otherwise claimed to be entitled to priority of payment, including persons claiming priority to payment under this Court's Second Amended Order Appointing Receiver (Docket No. 116); and including any professional fees and expenses incurred by or on behalf of the Receiver or former Receiver or their managers or agents (except as specifically excluded herein). A 'Post-Filing Claim' means the existence of a right to payment or an equitable remedy; and shall include any amounts claimed due for administrative costs or expenses; professional fees and expenses incurred by or on behalf of the former Receiver or its managers of agents (including HP/Management Group, Inc.); repayment of amounts advanced by or on behalf of the former Receiver or HP/Management Group, Inc.; repayment of other expenses incurred in the performance of the Receiver's

10

duties;  current or past due personal, real property, income, sales, use, or other taxes and assessments levied or assessed upon each separate Facility. A "Post-Filing Claim" shall not, however, include any amounts due or claimed to be due to Yeo & Yeo, P.C., the current Receiver, or its attorneys, Winegarden, Haley, Lindholm & Robertson, P.L.C., or professionals retained by said  persons, whose fees and expenses will be subject to separate procedures for approval and payment, so that the Receiver will not be the person making determinations as to any such claims. A Post-Filing Claim includes, but is not limited to (i) a demand for money, recoupment, set-off security, priority or preference; and (ii) demand for interest, penalties, fees or the recognition of liens, or other security interest. The Facilities are the following nursing homes,  previously  owned or operated by The Malachi Corporation, Inc., or its Receiver or manager:

    a.    Bay Shores Nursing Center, aka Tri-City Nursing Center, located at 3254 East Midland Road, Bay City, Michigan 48706 (the "Bay Shores Facility");

    b.    Marian Manor Nursing Care Center, located at 18591 Quarry Road, Riverview, Michigan 48192 (the "Riverview Facility");

    c.    Cambridge West Nursing Care Center, located at 18633 Beech Daly, Redford, Michigan 48240 (the "Redford Facility");

    d.    Gillett Nursing Home, located at 330 Robin Hood Lane, Gillett, Wisconsin 54124 (the "Gillett Facility");

11

e.  Wautoma Care Center Home, located at 327 South Waupaca Street, Wautoma, Wisconsin 54982 (the "Wautoma Facility");

f.  Sunnyview Village Health Care Center, located at 900 Sunnyview Lane, Princeton, Wisconsin 54968 (the "Princeton Facility"); and

g.  RiverBend Health & Rehabilitation Center, aka Manitowoc Health Care Services, located at South Rapids Road, Manitowoc, Wisconsin (the "Manitowoc Facility").

(2).  Within 30 days of the entry of this Order, the Receiver shall give or cause to be given Notice to all known and unknown potential Post-Filing Claimants of their right and obligation to present Post-Filing Claims to the Receiver:

a.  By ECF filing, as to any person or entity that is a registered ECF filer in this case, or whose attorney of record in this case is a registered ECF filer in this case (for this purpose, ECF service to an attorney in this case shall constitute service on that attorney's law firm as to any Post-Filing Claim that law firm may have); and by first class mail to all other potential Post-Filing Claimants as may be known to the Receiver, at their last known address, including (i) a notice of their

12

right to present claims to the Receiver, with a copy of this Order; and (ii) a copy of a Proof of Claim form.

b.      By publication in a newspaper of general circulation in each county in which any Facility was located.

(3).    The Notice served under Paragraph 2 shall provide that:

a.      Any person with a Post-Filing Claim arising on or after March 31, 1999, or which otherwise is claimed to have priority, must file a Post-Filing Proof of Claim with the Court, and also provide a copy to the Receiver, Yeo & Yeo, PC, Attn. Alan Rohde, CPA, at 4486 Oak Bridge Court, Flint, Michigan 48532, and to Winegarden Haley Lindholm & Robertson, PLC, Attn. L. David Lawson, 9460 S. Saginaw St., Ste. A, Grand Blanc, MI 48439, no later than May 20, 2008. The Post-Filing Proof of Claim shall categorize the Claim by Facility; and if a creditor has claims relating to more than one Facility, shall submit separate Proofs of Claim as to each Facility. If a Claim cannot be categorized by Facility, the Claim shall so indicate, and a separate compilation of claims not specific to a facility shall also be compiled. To the extent any Post-Filing Claim is based on ongoing activity or services for which there may be a basis for a future claim, including but not

13

limited to ongoing professional fees and expenses, the Post-Filing Claim shall include all such fees and expenses incurred through the end of the month immediately proceeding the entry of this Order; and state that there may be future amounts owed relating thereto.

b.     Post-Filing Claims existing as of the date of entry of this Order that are not filed and served on the Receiver by May 20, 2008, shall be conclusively deemed barred and disallowed, except that liens of record which are now validly perfected under applicable state law shall be deemed filed, but only to the extent of the value of the collateral securing any such claim.

c.     Each claimant shall file with its Post-Filing Proof of Claim documentary evidence of its claim as follows:

(i)     If the Claim, or an interest in property securing the Claim, is based on a writing, an exact duplicate of the writing or writings shall be filed with the Post-Filing Proof of Claim. Documentary evidence may include, but is not limited to, promissory notes, loan agreements, indentures, deeds of trusts, mortgages, security agreements, purchase orders, invoices, itemized statements of accounts, contracts, court judgments, or

14

evidence of security interest. If the writing or writings have been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim. If the documentary evidence is too voluminous to be attached and filed, it may be summarized on the Claim; and the Receiver shall have the right to obtain so much of the documentary evidence as it may request to evaluate the Claim, which additional information provided to the Receiver need not be filed, except as required to have a determination made as to the validity or priority of the Claim in further proceedings relating to the Claim.

(ii)   If a security interest is claimed, the Post-Filing Proof of Claim shall be accompanied by evidence that the security interest has been perfected, by means of a filed financing statement, mortgage, or otherwise.

(iii)   If a Post-Filing Proof of Claim is supported by documents that the filing party contends contain information that the Claimant contends is privileged or otherwise not properly disclosed, any such portions of such document    shall   be    redacted, without prejudice of the right of the Receiver to seek more

15

detailed information with respect to the basis of the Claim.

d. A Post-Filing Claim may be disallowed if the Claimant fails to file with its Post-Filing Proof of Claim documentary evidence of its claim as required by this Order, subject to determination by the Court, upon notice and opportunity to be heard, that a Post-Filing Claim should be allowed despite the lack of documentation as required.

e. A Post-Filing Proof of Claim shall be executed by the creditor or the creditor's authorized agent.

(4). If notice is given in accordance with paragraphs 2 and 3, the determination of Post-Filing Claims, the respective priority of such Claims as provided herein, and the distribution of any funds pursuant thereto shall be conclusive with respect to all parties and Claimants, whether or not they receive actual notice.

(5). The Receiver, or its counsel, shall chronologically catalog all Post-Filing Claims received by compiling a list by Facility, including (i) Claimant name, (ii) amount of Claim, (iii) asserted priority (iv) and any other pertinent information the Receiver feels necessary. If a Post-Filing Claim cannot be categorized by Facility, the Post-Filing Claim shall so indicate, and a separate compilation of Claims not specific to a Facility shall also be compiled.

16

(6).    On or before June 20, 2008, the Receiver shall file a Report to the Court summarizing the Post-Filing Proofs of Claims filed. The Receiver, the Trustee, and HP/Management Group, Inc., may each object to any Claim filed. Any objections to a Claim shall be filed by June 30, 2008. There shall be a Status Conference held on a date to be set by the Court, to review this Report, and for consideration of a procedure governing objections to Post-Filing Claims and other issues, including discovery, briefing schedules and Trial, if necessary. This Post-Filing Claims Procedure shall not alter the priority of distributions as set forth in the Second Amended Order Appointing Receiver (Docket No. 116).

(7).    This Court has exclusive jurisdiction to order and determine the validity, priority and amount of all Claims filed.    This Court continues to assert and to maintain sole and exclusive jurisdiction, to the exclusion of all other Courts or Tribunals, over and to all assets of the Facilities or the Receivership Estates of whatsoever kind or nature and wherever or however owned or held. Liens of record which are validly perfected under applicable State law shall be deemed filed, but    only to the extent of the value of the collateral. Judgments, awards, or claims    of any kind not filed with the Court in accordance with this  Order shall be unenforceable against the Facilities, the Receivership Estates, the Receiver, or any of their said assets.

17

(8).     Any applicable statute of limitations is tolled as to any Post-

Filing Claim that is timely and properly filed.

9.     Transfer of Title.   Nothing in this Order shall be construed to transfer

beneficial ownership of Receivership property to the Receiver.  The Receiver shall hold

legal title to the assets of the Receivership Estates for the benefit of the Trustee, as the

holder of a first secured claim for the benefit of the Bondholders, and other creditors.

Nothing in this Order shall be construed as having any effect upon the claims or priorities

of the claimants, unless those claims have been barred under the Order Approving Claims

Procedure, or this Order. Any determination and allowance of the claims and priority of the

claimants shall be by Order of this Court upon motion and notice.

10.     Employment of Legal Counsel.  The Receiver is granted authority to employ

Winegarden Haley Lindholm & Robertson, PLC as general counsel to assist in the

performance of all duties given to the Receiver under this Order.

11.     Compensation for the Receiver and Counsel.

a.     The Receiver shall be compensated for all services rendered on an

hourly basis at rates which range from $58 per hour to $215 per hour, for the

professionals listed on Exhibit B to its Motion, and shall be entitled to

reimbursement for its actual, necessary and reasonable expenses, as

described in Paragraph 6 of this order. The Winegarden law firm shall be

reimbursed for all services rendered to the Receiver under this Order on an

hourly basis at rates which range from $175 to $295 per hour, for the

professionals listed on Exhibit C to the Motion, and shall be entitled to a

reimbursement for its actual, necessary and reasonable expenses as

18

described in paragraph 6 of this Order. The rates of reimbursement may change as rates the Receiver's and the Winegarden law firm's ordinary and customary rates that for services change.

b.    The Receiver and the Winegarden law firm shall each prepare a monthly invoice for services rendered, by the 20th of the month for all previous services and expenses, beginning in April, 2008, including services and expenses predating this Order. The invoice shall itemize the services to at least the nearest tenth of the hour; shall provide a narrative description of the services; attempt to identify the Receivership Estate or Estates benefitted by the service or expense; and shall identify the person performing the service. The bill shall also detail all expenses incurred. Invoices shall be filed with the Court and served upon the Trustee's counsel and   to any claimant requesting copies. If no objection is filed within 21 days from the date the billing is filed and served, then the Receiver shall disburse the amount of the invoice, less a 20% hold back. If there is an objection to an invoice filed within the 21 day period, then a hearing shall be held on the objection. No more frequently than once every 120 days, the Receiver and the Winegarden law  firm may file a motion for the full allowance of compensation for all services covered by the monthly invoices, including holdback, with notice to all claimants.

c.    In any of the invoices, the Receiver and the Winegarden law firm may redact  any information relating to the Adversary Proceedings or other matters that the Receiver or the Winegarden law firm deem, in their sole

19

discretion, to be subject to attorney/client privilege, the work product privilege, or any other applicable privilege or duty of confidentiality.

d.   The reimbursement of fees for professional services shall be subject to final allowance upon termination of this receivership proceeding.

12.   First Lien.  The Receiver and the Winegarden law firm are hereby granted a lien and priority over all other claimants and other parties in the Property of the Receivership Estates, to secure the payment of professional fees and expenses.

13.   Allocation of Expenses.  Disbursements made by the Receiver shall be funded from those Receivership Accounts which, in the judgment of the Receiver, stand to benefit from the activities supported by the disbursements, and the Receiver may make disbursements from the separate accounts maintained for the Receivership Estates for expenses as provided herein.  If the Receiver is not able to allocate expenses to a particular Receivership Estate, the expense may be allocated to and paid from unallocated funds.  This allocation is subject to final determination and allowance by the Court as a part of the Receiver's final accounting.  Activities of the Receiver which are administrative in nature and applied generically to all of the Receivership Estates shall be allocated to funds held as unallocated funds, or in proportion to the balance of funds on hand with the Receivership Estates.

14.   Allocation of Income.  Any income received by the Receiver shall initially be allocated by the Receiver, in the exercise of its business judgment, based upon the determination that the income represents the Property of a Receivership Estate; or if the funds can not be so allocated, to the unallocated funds.  This allocation shall be subject to

20

a final determination and allowance by the Court as a part of the Receiver's final accounting.

15.     Allocation of Held Funds. Pursuant to a previous Order of the Court, funds have been paid by HealthLink Services, LLC, to the Bondholder Trustee. The Receiver will make an investigation to confirm that the funds currently allocated to Receivership Estates are appropriately allocated. As to currently unallocated funds, the Receiver will determine whether such funds can be allocated to Receivership Estates and, to the extent such unallocated funds cannot be reasonably allocated to any particular Receivership Estate, or such funds are required as a reserve for payment of future administrative expenses, such funds shall remain in unallocated accounts for administrative claims.

16.     Injunction. Except as specifically provided herein and with respect to litigation of claims in the Adversary Proceedings, no person or entities shall file suit against the Receiver or take action against the Receiver or the Receivership Property without an order of this Court permitting such action. The parties to this receivership proceeding, including all claimants, and those in active participation or concert with them who receive notice of this Order, are enjoined from interfering with the Receivership actions in furtherance of the performance of the duties of this order. The sole and absolute legal authority to administer the claims of the receivership estates belongs to the Receiver.

17.     Liability. The Receiver and the Winegarden law firm, and their respective employees, agents and representatives, shall have no liability and shall have no claim asserted against them relating to the performance of services under this Order, except those arising from intentional tortious acts, breaches of fiduciary duty, acts conducted in bad faith, gross or willful misconduct, or the willful failure to comply with the terms of this Order or any other order of this Court. The Receivership Estates shall indemnify the

21

Receiver and the Winegarden law firm for any costs, expenses, losses or damages, including attorney's fees arising from claims and liabilities against the Receivers which are prohibited by this Paragraph.

18.     Resignation of Receiver.  The Receiver or the Receiver's counsel may, in their sole discretion, notify   the Court and the parties of the Receiver's proposed resignation. An Order discharging the Receiver shall not be entered unless and until the Receiver has provided a final accounting as described in paragraph 20, below.  If any interested party objects to the Receiver's resignation, then the Court shall conduct a hearing.

19.     Removal of the Receiver.  The Receiver or the Receiver's counsel may be removed by order of the Court upon a motion for cause.  If interested parties are not able to agree upon a successor receiver, then the Court shall appoint a successor receiver.

20.     Final Accounting.  The Receiver shall file a final accounting which shall contain the following information:

> a.     A report regarding the Adversary Proceedings and any other suits, arbitrations or proceedings to collect Property of the Receivership Estates;
>
> b.     A complete cash receipts and disbursements report;
>
> c.     A description of any tax returns or other governmental reports or returns the Receiver has been required to file during the term of this Order;
>
> d.     The   Receiver's   proposed distribution of assets and analysis identifying the priorities of the respective claimants;
>
> e.     An analysis of the Receiver's allocation of the proceeds of the separate receivership estates; and

22

    f.    A report on the allowance of claims.

Notice of the final report shall be provided to all interested parties. If no objection is filed within 28 days, an order approving the report shall be entered. If there is an objection, a hearing will be held. Otherwise, the Court will enter an order approving the Receiver's final accounting.

Upon entry of the order approving the Receiver's final accounting, the Receiver shall make a final distribution of assets. Upon submitting a report to the Court confirming the distribution of the assets, the Court shall enter an order discharging the Receiver.

21.    <u>Interim Distribution.</u>  The Receiver may, from time to time, upon a determination that the administration of the receivership will not be affected, file a motion proposing an interim distribution of assets upon notice and opportunity for hearing. As a part of the motion, the Receiver shall support the proposed distribution with an analysis of the priorities.

22.    <u>Amendment of Order.</u>  This Order may be amended  after motion and a hearing.

23.    <u>Notice of the Entry of an Order.</u>  Within seven (7) days of entry, the Receiver shall serve this Order on all interested parties by regular first class mail who do not receive notification through the ECF system.

24.    <u>Effective Date.</u>  This Order  shall be immediately effective.

s/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated: March 17, 2008

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on March 17, 2008.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**99-40146**

NORWEST BANK WISCONSIN, NATIONAL
ASSOCIATION,
                    Plaintiff(s),

v.

THE MALACHI CORPORATION, INC.,
                    Defendant(s).

CASE NUMBER: 99-71415

HONORABLE LAWRENCE P. ZATKOFF

MAGISTRATE JUDGE VIRGINIA M. MORGAN

## ORDER REGARDING REASSIGNMENT OF COMPANION CASE
## AND TRANSER TO FLINT DIVISIONAL OFFICE

This case appears to be a companion case to **99-40096.** Pursuant to **LR 83.11,** the Clerk is directed to reassign this case to the docket of the **HONORABLE PAUL V. GADOLA** and **MAGISTRATE JUDGE PAUL J. KOMIVES.**

LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

PAUL V. GADOLA
UNITED STATES DISTRICT JUDGE          4/6/99

I hereby certify that the foregoing is a true copy of the original on file in this Office. CLERK, U.S. DISTRICT COURT EASTERN DISTRICT OF MICHIGAN By _____ Deputy Clerk Dated 2/19/08

Pursuant to this order, case assignment credit will be given to the appropriate Judicial Officers. Please indicate the appropriate case type: **CIVIL.**

If the District Judge assigned to the companion case is located at another place of holding court, the new case number is ___99-40146___.

Date: __4-9-99__

Deputy Clerk

cc:  Counsel of Record
     Receiving Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



99-40146

**99-71415**

Case No. **PAUL D. BORMAN**

Norwest Bank Wisconsin, National Association,
a Wisconsin Banking Corporation, as Trustee

          Plaintiff,

v.

Malachi Corporation, Inc.

          Defendant.

_____/

**MAGISTRATE JUDGE MORGAN**

**F I L E**

MAR 2 3 1999

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

## COMPLAINT

NOW COMES NORWEST BANK WISCONSIN, NATIONAL ASSOCIATION,

by and through its attorneys, PEPPER HAMILTON LLP and DORSEY & WHITNEY LLP,

and for its complaint against Defendant Malachi Corporation, Inc. states as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Norwest Bank Wisconsin, National Association ("Norwest") is a

Wisconsin banking corporation with its principal place of business in Milwaukee, Wisconsin.

2.    Upon information and belief, Defendant Malachi ("Malachi") is a not-for-

profit Illinois corporation with its principal place of business in Chicago, Illinois.

3.    This Court has subject matter jurisdiction based on 28 U.S.C. § 1332(a)(1)

as the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and

complete diversity of citizenship exists between the parties.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because the

Defendant does business in this district, because a substantial portion of the events and omissions

giving rise to the claims arose in this district, and because a substantial part of the property which is the basis for this action is situated in this district.

## BACKGROUND

5.    Norwest is the Indenture Trustee (the "Trustee") of six different revenue bond issues (of two series each)(the "Bonds") which were to be used to finance the acquisition or construction of three long term care facilities located in Michigan and four long term care facilities located in Wisconsin (the "Facilities").

6.    The Michigan Facilities are: (i) Cambridge West Nursing Care Center, located at 18633 Beech Daly, Redford, Michigan 48240 (the "Redford Facility"); (ii) Marian Manor Nursing Care Center, located at 18591 Quarry Road, Riverview, Michigan 48192 (the "Riverview Facility"); and (iii) Bay Shores Nursing Center, located at 3254 East Midland Road, Bay City, Michigan 48706 (the "Bangor Facility");

7.    The relevant bonds issued for the finance of the Redford Facility were The Economic Development Corporation of the Charter Township of Redford Limited Obligation Revenue Bonds Series 1998A in the amount of $6,095,000.00, and The Economic Development Corporation of the Charter Township of Redford Limited Obligation Taxable Revenue Bonds Series 1998B in the amount of $360,000.00.

8.    The relevant bonds issued for the finance of the Riverview Facility were The Economic Development Corporation of the City of Riverview Limited Obligation Revenue Bonds Series 1998A in the amount of $3,650,000.00, and The Economic Development Corporation of the City of Riverview Limited Obligation Taxable Revenue Bonds Series 1998B in the amount of $215,000.00.

-2-

9.   The relevant bonds issued for the finance of the Bangor Facility were The Economic Development Corporation of the Charter Township of Bangor Limited Obligation Revenue Bonds Series 1998A in the amount of $10,455,000.00, and The Economic Development Corporation of the Charter Township of Bangor Limited Obligation Taxable Revenue Bonds Series 1998B in the amount of $625,000.00.

10.   The total principal amount of the Bonds issued in Michigan was $21,400,000.00.

11.   The Wisconsin Facilities are: (i) Sunnyview Village Health Care Center located at 900 Sunnyview Lane, Princeton, Wisconsin, 54968 (the "Princeton Facility"); (ii) RiverBend Health & Rehabilitation Center located at South Rapids Road, Manitowoc, Wisconsin (the "Manitowoc Facility"); (iii) Wautoma Care Center Home located at 327 South Waupaca Street, Wautoma, Wisconsin, 54982 (the "Wautoma Facility"); and (iv) Gillett Nursing Home located at 330 Robin Hood Lane, Gillett, Wisconsin, 54124 (the "Gillett Facility").

12.   The relevant bonds issued for the finance of the Princeton Facility were The Wisconsin Health and Education Facilities Authority Revenue Bonds (Malachi Corporation Project) Series 1996A in the amount of $2,700,000.00, and The Wisconsin Health and Education Facilities Authority Taxable Revenue Bonds (Malachi Corporation Project) Series 1996B in the amount of $230,000.00.

13.   The relevant bonds issued for the finance of the Manitowoc Facility were The Wisconsin Health and Education Facilities Authority Revenue Bonds (Malachi Corporation-Manitowoc Project) Series 1996A in the amount of $5,020,000.00, and The Wisconsin Health

-3-

and Education Facilities Authority Taxable Revenue Bonds (Malachi Corporation-Manitowoc Project) Series 1996B in the amount of $480,000.00.

14.     The relevant bonds issued for the finance of the Wautoma Facility and the Gillett Facility were The Wisconsin Health and Education Facilities Authority Revenue Bonds (Malachi Corporation-Gillett and Wautoma Project) Series 1996A in the amount of $4,030,000.00, and The Wisconsin Health and Education Facilities Authority Taxable Revenue Bonds (Malachi Corporation-Gillett and Wautoma Project) Series 1996B in the amount of $350,000.00.

15.     The total principal amount of the bonds issued in Wisconsin was $12,810,000.00.

16.     The total principal amount of the Bonds issued in both states was $34,210,000.00.

17.     Pursuant to the governing Indentures and Loan Agreements executed in connection with each Facility, the Trustee holds, either directly or by assignment from the applicable bond issuer, a mortgage, a security interest in the receivables, general intangibles, inventory, equipment and records relating to each Facility, and an assignment of the rents against each Facility as part of the security for the repayment of the Bonds.

18.     The interest and principal on the Bonds is to be paid from the revenues generated by the Facilities.

19.     Malachi is both the obligor on the Bonds and the owner of the Facilities.

20.     From the dates the Bonds were issued until March 18, 1999, Malachi delegated all management of the Facilities to HealthBank Development, Inc., or its affiliates, (the

-4-

"Manager") pursuant to Management Agreements between the Manager and the Defendant (the "Management Agreements"). The Manager and the Defendant entered into one Management Agreement for all three Michigan Facilities, and entered into separate Management Agreements for each of the four Wisconsin Facilities. True and correct copies of the Management Agreements are collectively attached hereto and incorporated herein as Exhibit A.

21.     Malachi is presently in default under its obligations to repay the Bonds.

22.     On January 26, 1999, the Trustee accelerated all of the principal and interest due on the bonds issued to finance the Gillett and Wautoma Facilities, and on February 1, 1999, the Trustee accelerated all of the principal and interest due on the bonds issued to finance each of the other Facilities. See true and correct copies of the January 26, 1999 letter from the Trustee to Malachi with respect to the Gillett and Wautoma Facilities, and the February 1, 1999 letters from the Trustee to Malachi with respect to each of the other Facilities (the "Acceleration Letters"), which are collectively attached hereto and incorporated herein as Exhibit B.

23.     The total amount of principal and interest currently outstanding on the Bonds is in excess of $35,000,000.00.

24.     Despite repeated requests by the Trustee for financial statements for the Facilities, Malachi and the Manager have failed to provide responsive information.

25.     Upon information and belief, while the Management Agreements were in effect, the Manager operated the Facilities and collected all of the income derived therefrom.

26.     Among the Manager's obligations under each of the Management Agreements were: (i) arranging for timely payments on the debt service on behalf of Malachi; (ii) granting reasonable access to the Facilities' books and records; (iii) producing and

disseminating certain financial reports; (iv) subordinating any management fees payable to the Defendant to the timely payment of the debt service; and (v) arranging for timely payments of all real estate and personal property taxes on behalf of Malachi. See Exhibit A.

27.    Despite the Manager's obligations in the Management Agreements, the Manager has paid nothing to the Trustee since September 1998 with respect to the Michigan bond issuances, and has paid nothing to the Trustee since October 1998 with respect to the Wisconsin bond issuances.

28.    On February 26, 1999, Malachi elected to terminate the Management Agreements pursuant to the terms of those agreements, and sent 20 days written notice of its election to terminate to the Manager. See February 26, 1999 letter from Malachi to the Manager (the "Termination Letter"), attached hereto as Exhibit C.

29.    Pursuant to the Termination Letter, the Management Agreements were terminated on March 18, 1999. See Exhibit C.

30.    Upon information and belief, the Manager continues to have possession of the Facilities.

31.    The real estate taxes related to the Facilities have not been paid and are now delinquent.

32.    The personal property taxes related to the Facilities have not been paid and are now delinquent.

33.    As of March 8, 1999, the Manager had failed to make payments of payroll taxes due in connection with the Facilities in the total amount of $795,341.00.

34. On March 5, 1999, the Trustee filed an action in this Court demanding an accounting by the Manager as to the Michigan Facilities. The case number of that action is 99-40096.

35. On March 5, 1999, the Trustee also filed an action in Wisconsin Circuit Court for Manitowoc County demanding an accounting by the Manager as to the Wisconsin Facilities. The case number of that action is 99CV-066.

### THE REDFORD ISSUE

36. As of May 15, 1998, pursuant to Act No. 338, Public Acts of Michigan, as amended, The Economic Development Corporation of the Charter Township of Redford, Michigan (the "Redford Issuer") issued Limited Obligation Revenue Bonds, Series 1998A and Limited Obligation Taxable Revenue Bonds, Series 1998B (the "Redford Bonds") in the aggregate principal amount of $6,455,000. The Redford Issuer and the Trustee entered into an Indenture dated as of May 15, 1998, pursuant to which the Trustee has at all times acted as the Trustee in connection with the Redford Bonds (the "Redford Indenture").

37. The Redford Issuer loaned the proceeds from the sale of the Redford Bonds (the "Redford Loan") to Malachi to finance Malachi's acquisition of the Redford Facility under the terms of a Loan Agreement between Malachi and the Redford Issuer dated as of May 15, 1998 (the "Redford Loan Agreement"). The Redford Loan is evidenced by a promissory note dated May 15, 1998 executed by Malachi in favor of the Redford Issuer, which the Redford Issuer endorsed in favor of the Trustee (the "Redford Note"). A true and correct copy of the Redford Loan Agreement is attached hereto and incorporated herein as Exhibit D. A true and correct copy of the Redford Note is attached hereto and incorporated herein as Exhibit E.

-7-

38.     Pursuant to the Redford Indenture, as security for the indebtedness to the bondholders evidenced by the Redford Bonds, the Redford Issuer pledged and assigned to the Trustee, among other things: (i) all loan repayments which Malachi was obligated to pay under the Redford Loan Agreement and Redford Note, (ii) all the Redford Issuer's rights and interests under the Redford Loan Agreement and the Redford Note; (iii) all of the Redford Issuer's rights and interests under the Redford Mortgage, as defined below; (iv) all moneys in the Bond Fund, the Reserve Fund, and the Project Fund as those terms are defined and as created in the Redford Indenture; and (v) all of the proceeds of the foregoing, including investment income. A true and correct copy of the Redford Indenture is attached hereto and incorporated herein as Exhibit F.

39.     As further security for the Redford Loan and its obligations under the Redford Loan Agreement, Malachi delivered to the Trustee a certain Mortgage and Security Agreement dated May 15, 1998 (the "Redford Mortgage") against the Redford Facility. The Redford Mortgage was duly filed in the offices of the Register of Deeds for Wayne County, Michigan on July 17, 1998, and recorded at Liber 29906, Page 2448.0. The Redford Mortgage is cross-collateralized and secures not only Malachi's obligations under the Redford Loan Agreement, but also Malachi's obligations under the Riverview Loan Agreement (as defined below) and Malachi's obligation under the Bangor Loan Agreement (as defined below). A true and correct copy of the recorded Redford Mortgage is attached hereto and incorporated herein as Exhibit G.

40.     Pursuant to the Redford Mortgage, Malachi granted the Trustee a security interest in (i) the Redford Facility (the real property and all buildings and improvements thereon), (ii) all personal property purchased with the proceeds of the Redford Loan, (iii) all chattels,

-8-

receivables, general intangibles, inventory, equipment, and records related to the Redford

Facility, (iv) all proceeds, and (v) all leases and rentals from the Redford Facility.

41.    Pursuant to Section 1.09 of the Redford Mortgage, Malachi assigned to the

Trustee all leases, rents, issues and royalties from the Redford Facility.

42.    Malachi executed a UCC Financing Statement in favor of the Trustee

evidencing Trustee's security interest in Malachi's assets relating to the Redford Facility (the

"Redford Financing Statement"). A true and correct copy of the Redford Financing Statement is

attached hereto and incorporated herein as Exhibit H.

### THE RIVERVIEW ISSUE

43.    As of May 15, 1998, pursuant to Act No. 338, Public Acts of Michigan, as

amended, The Economic Development Corporation of the City of Riverview, Michigan (the

"Riverview Issuer") issued Limited Obligation Revenue Bonds, Series 1998A and Limited

Obligation Taxable Revenue Bonds, Series 1998B (the "Riverview Bonds") in the aggregate

principal amount of $3,865,000. The Riverview Issuer and the Trustee entered into an Indenture

dated as of May 15, 1998, pursuant to which the Trustee has at all times acted as Indenture

Trustee in connection with the Riverview Bonds (the "Riverview Indenture").

44.    The Riverview Issuer loaned the proceeds from the sale of the Riverview

Bonds (the "Riverview Loan") to Malachi to finance Malachi's acquisition of the Riverview

Facility under the terms of a Loan Agreement  between Malachi and the Riverview Issuer dated

May 15, 1998 (the "Riverview Loan Agreement"). The Riverview Loan is evidenced by a

promissory note dated May 15, 1998 executed by Malachi in favor of the Riverview Issuer,

which the Riverview Issuer endorsed in favor of the Trustee (the "Riverview Note"). A true and

correct copy of the Riverview Loan Agreement is attached hereto and incorporated herein as Exhibit I. A true and correct copy of the Riverview Note is attached hereto and incorporated herein as Exhibit J.

45.     Pursuant to the Riverview Indenture as security for the indebtedness to the bondholders evidenced by the Riverview Bonds, the Riverview Issuer pledged and assigned to the Trustee, among other things: (i) all loan repayments which Malachi was obligated to pay under the Riverview Loan Agreement and Riverview Note, (ii) all the Riverview Issuer's rights and interests under the Riverview Loan Agreement; (iii) all of the Riverview Issuer's rights and interests under the Riverview Mortgage, as defined below, (iv) all moneys in the Bond Fund, the Reserve Fund, and the Project Fund as those terms are defined and as created in the Riverview Indenture; and (v) all of the proceeds of the foregoing, including investment income. A true and correct copy of the Riverview Indenture is attached hereto and incorporated herein as Exhibit K.

46.     As further security for the Loan and its obligations under the Riverview Loan Agreement, Malachi delivered to the Trustee a certain Mortgage and Security Agreement dated May 15, 1998 (the "Riverview Mortgage") against the Riverview Facility. The Riverview Mortgage was duly filed in the offices of the Register of Deeds for Wayne County, Michigan on July 17 1998, and recorded at Liber 29906, Page 1827.0. The Riverview Mortgage, is cross-collateralized and secures not only Malachi's obligations under the Riverview Loan Agreement, but also Malachi's obligations under the Redford Loan Agreement and the Bangor Loan Agreement (as defined below). A true and correct copy of the Riverview Mortgage is attached hereto and incorporated herein as Exhibit L.

47.    Pursuant to the Riverview Mortgage, Malachi granted the Trustee a security interest in (i) the Riverview Facility (the real property and all buildings and improvements thereon), (ii) all personal property purchased with the proceeds of the Riverview Loan, (iii) all chattels, receivables, general intangibles, inventory, equipment and records related to the Riverview Facility, (iv) all proceeds, and (v) all leases and rentals from the Riverview Facility.

48.    Pursuant to Section 1.09 of the Riverview Mortgage, Malachi assigned to the Trustee all leases, rents, issues and royalties from the Riverview Facility.

49.    Malachi executed a UCC Financing Statement in favor of the Trustee evidencing the Trustee's security interest in Malachi's assets relating to the Riverview Facility (the "Riverview Financing Statement"). A true and correct copy of the Riverview Financing Statement is attached hereto and incorporated herein as Exhibit M.

## THE BANGOR ISSUE

50.    As of May 15, 1998, pursuant to Act No. 338, Public Acts of Michigan, as amended, The Economic Development Corporation of the Charter Township of Bangor, Michigan (the "Bangor Issuer") issued Limited Obligation Revenue Bonds, Series 1998 A and Limited Obligation Taxable Revenue Bonds, Series 1998B (the "Bangor Bonds") in the aggregate principal amount of $11,080,000. The Bangor Issuer and the Trustee entered into an Indenture dated as of May 15, 1998, pursuant to which the Trustee has at all times acted as Indenture Trustee in connection with the Bangor Bonds (the "Bangor Indenture").

51.    The Bangor Issuer loaned the proceeds from the sale of the Bangor Bonds (the "Bangor Loan") to Malachi to finance Malachi's acquisition of the Bangor Facility under the

-11-

terms of a Loan Agreement and Note between Malachi and the Bangor Issuer dated May 15, 1998 (the "Bangor Loan Agreement"). The Bangor Loan is evidenced by a promissory note dated May 15, 1998 executed by Malachi in favor of the Bangor Issuer, which the Bangor Issuer endorsed in favor of the Trustee (the "Bangor Note"). A true and correct copy of the Bangor Loan Agreement is attached hereto and incorporated herein as Exhibit N. A true and correct copy of the Bangor Note is attached hereto and incorporated herein as Exhibit O.

52.     Pursuant to the Bangor Indenture, as security for the indebtedness to the bondholders evidenced by the Bangor Bonds, the Bangor Issuer pledged and assigned to the Trustee, among other things (i) all loan repayments which Malachi was obligated to pay and the Bangor Loan Agreement and Bangor Note, (ii) all the Bangor Issuer's rights and interests under the Bangor Loan Agreement and Bangor Note; (iii) all of the Bangor Issuer's rights and interests under the Bangor Mortgage, as defined below; (iv) all moneys in the Bond Fund, the Reserve Fund, and the Project Fund as those terms are defined in and as created in the Bangor Indenture; and (v) all of the proceeds of the foregoing, including investment income. A true and correct copy of the Bangor Indenture is attached hereto and incorporated herein as Exhibit P.

53.     As further security for the Bangor Loan and its obligations under the Bangor Loan Agreement, Malachi delivered to the Trustee a certain Mortgage and Security Agreement dated May 15, 1998 (the "Bangor Mortgage") against the Bangor Facility. The Bangor Mortgage was duly filed in the offices of the Register of Deeds for Bay County, Michigan on June 16, 1998, and recorded at Liber 1536, Page 525. The Bangor Mortgage is cross-collateralized and secures not only Malachi's obligations under the Bangor Loan Agreement, but also Malachi's obligations under the Redford Loan Agreement and Malachi's

-12-

obligations under the Riverview Loan Agreement. A true and correct copy of the recorded Bangor Mortgage is attached hereto and incorporated herein as Exhibit Q.

54.     Pursuant to the Bangor Mortgage, Malachi granted the Trustee a security interest in (i) the Bangor Facility (the real property and all buildings and improvements thereon), (ii) all personal property purchased with the proceeds of the Bangor Loan, (iii) all chattels, receivables, general intangibles, inventory, equipment and records related to the Bangor Facility, (iv) all proceeds, and (v) all leases and rental from the Bangor Facility.

55.     Pursuant to Section 1.09 of the Bangor Mortgage, Malachi assigned to the Trustee all leases, rents, issues and royalties relating to the Bangor Facility.

56.     Malachi executed a UCC Financing Statement in favor of the Trustee evidencing the Trustee's security interest in Malachi's assets relating to the Bangor Facility (the "Bangor Financing Statement") . A true and correct copy of the Bangor Financing Statement is attached hereto and incorporated herein as Exhibit R.

## THE WISCONSIN ISSUE FOR THE PRINCETON FACILITY

57.     As of June 1, 1996, pursuant to Chapter 231 of the Wisconsin Statutes, as amended, The Wisconsin Health and Education Facilities Authority (the "Princeton Issuer") issued Revenue Bonds Series 1996A and Taxable Revenue Bonds Series 1996B (the "Princeton Bonds") in the aggregate principal amount of $2,930,000,00. The Princeton Issuer and the Trustee entered into an Indenture dated as of June 1, 1996, pursuant to which the Trustee has at all times acted as Indenture Trustee in connection with the Princeton Bonds (the "Princeton Indenture").

-13-

58.    The Princeton Issuer loaned the proceeds from the sale of the Princeton Bonds (the "Princeton Loan") to Malachi to finance Malachi's acquisition of the Princeton Facility under the terms of a Loan Agreement between Malachi and the Princeton Issuer dated June 1, 1996 (the "Princeton Loan Agreement"). The Princeton Loan is evidenced by a promissory note dated June 1, 1996, executed by Malachi in favor of the Princeton Issuer, which the Princeton Issuer endorsed in favor of the Trustee (the "Princeton Note"). A true and correct copy of the Princeton Loan Agreement is attached hereto and incorporated herein as Exhibit S. A true and correct copy of the Princeton Note is attached hereto and incorporated herein as Exhibit T.

59.    Pursuant to the Princeton Indenture, as security for the indebtedness to the bondholders evidenced by the Princeton Bonds, the Princeton Issuer pledged and assigned to the Trustee, among other things:  (i) all the Princeton Issuer's rights and interests under the Princeton Loan Agreement and the Princeton Note; (ii) all of the Princeton Issuer's rights and interests under the Princeton Mortgage, as defined below; (iii) all payments derived by the Princeton Issuer or the Trustee pursuant to the Princeton Loan Agreement and Princeton Note; and (iv) all moneys and securities held by the Trustee under the terms of the Princeton Indenture. A true and correct copy of the Princeton Indenture is attached hereto and incorporated herein as Exhibit U.

60.    As further security for the Loan and its obligations under the Princeton Loan Agreement, Malachi delivered to the Princeton Issuer a certain Mortgage, Assignment of Rents, and Security Agreement dated June 1, 1996, (the "Princeton Mortgage") against the Princeton Facility. The Princeton Mortgage was duly filed in the offices of the Green Lake County Register of Deeds on June 26, 1996, and recorded at Volume 460, Page 30. The

-14-

Princeton Issuer assigned the Princeton Mortgage to the Trustee by Assignment dated June 1, 1996, and recorded in the Green Lake County Register of Deeds on June 26, 1996 at Volume 460, Page 56. A true and correct copy of the Princeton Mortgage is attached hereto and incorporated herein as Exhibit V.

61.     Pursuant to the Princeton Mortgage, Malachi granted the Princeton Issuer a security interest in: (i) the Princeton Facility (the real property and all buildings and improvements thereon); (ii) all tangible personal property which is part of the Princeton Facility; (iii) all contracts, chattels, receivables, general intangibles, inventory, equipment, and records related to the Princeton Facility; (iv) all certificates of need, licenses, permits, and approvals; (v) all proceeds; and (vi) all leases and rentals from the Princeton Facility.

62.     Pursuant to Section 5.1 of the Princeton Mortgage, Malachi assigned to the Trustee all leases, rents, issues, and profits from the Princeton Facility.

## THE WISCONSIN ISSUE FOR THE MANITOWOC FACILITY

63.     As of October 1, 1996, pursuant to Chapter 231 of the Wisconsin Statutes, as amended, The Wisconsin Health and Education Facilities Authority (the "Manitowoc Issuer") issued Revenue Bonds Series 1996A and Taxable Revenue Bonds Series 1996B (the "Manitowoc Bonds") in the aggregate principal amount of $5,500,000,00. The Manitowoc Issuer and the Trustee entered into an Indenture dated as of October 1, 1996, pursuant to which the Trustee has at all times acted as Indenture Trustee in connection with the Manitowoc Bonds (the "Manitowoc Indenture").

64.     The Manitowoc Issuer loaned the proceeds from the sale of the Manitowoc Bonds (the "Manitowoc Loan") to Malachi to finance Malachi's construction of the Manitowoc

-15-

Facility under the terms of a Loan Agreement between Malachi and the Manitowoc Issuer dated October 1, 1996 (the "Manitowoc Loan Agreement"). The Manitowoc Loan is evidenced by a promissory note dated October 1, 1996, executed by Malachi in favor of the Manitowoc Issuer, which the Manitowoc Issuer endorsed in favor of the Trustee (the "Manitowoc Note"). A true and correct copy of the Manitowoc Loan Agreement is attached hereto and incorporated herein as Exhibit W. A true and correct copy of the Manitowoc Note is attached hereto and incorporated herein as Exhibit X.

65.    Pursuant to the Manitowoc Indenture, as security for the indebtedness to the bondholders evidenced by the Manitowoc Bonds, the Manitowoc Issuer pledged and assigned to the Trustee, among other things: (i) all the Manitowoc Issuer's rights and interests under the Manitowoc Loan Agreement and the Manitowoc Note; (ii) all of the Manitowoc Issuer's rights and interests under the Manitowoc Mortgage, as defined below; (iii) all payments derived by the Manitowoc Issuer or the Trustee pursuant to the Manitowoc Loan Agreement and the Manitowoc Note; and (vi) all moneys and securities held by the Trustee under the terms of the Manitowoc Indenture. A true and correct copy of the Manitowoc Indenture is attached hereto and incorporated herein as Exhibit Y.

66.    As further security for the Loan and its obligations under the Manitowoc Loan Agreement, Malachi delivered to the Manitowoc Issuer a certain Mortgage, Assignment of Rents, and Security Agreement dated October 1, 1996 (the "Manitowoc Mortgage") against the Manitowoc Facility. The Manitowoc Mortgage was duly filed in the offices of the Manitowoc County Register of Deeds on October 23, 1996, and recorded at Volume 1194, Page 342. The Manitowoc Issuer assigned the Manitowoc Mortgage to the Trustee by an Assignment dated

-16-

October 1, 1996 and recorded in the Manitowoc County Register of Deeds on October 23, 1996, and recorded at Volume 1194, Page 368. A true and correct copy of the Manitowoc Mortgage is attached hereto and incorporated herein as Exhibit Z.

67.    Pursuant to the Manitowoc Mortgage, Malachi granted the Manitowoc Issuer a security interest in: (i) the Manitowoc Facility (the real property and all buildings, fixtures, and improvements thereon); (ii) all tangible personal property which is part of the Manitowoc Facility; (iii) all contracts, chattels, receivables, general intangibles, inventory, equipment and records related to the Manitowoc Facility; (iv) all certificates of need, licenses, permits, and approvals; (v) all proceeds; and (vi) all leases and rentals from the Manitowoc Facility.

68.    Pursuant to Section 5.1 of the Manitowoc Mortgage, Malachi assigned to the Trustee all leases, rents, issues and profits from the Manitowoc Facility.

69.    Malachi executed a UCC Financing Statement in favor of the Trustee evidencing the Trustee's security interest in Malachi's assets relating to the Manitowoc Facility (the "Manitowoc Financing Statement"). A true and correct copy of the Manitowoc Financing Statement is attached hereto and incorporated herein as Exhibit AA.

## THE WISCONSIN ISSUE FOR THE GILLETT AND WAUTOMA FACILITIES

70.    As of February 1, 1997, pursuant to Chapter 231 of the Wisconsin Statutes, as amended, The Wisconsin Health and Education Facilities Authority (the "Gillett and Wautoma Issuer") issued Revenue Bonds Series 1996A and Taxable Revenue Bonds Series 1996B (the "Gillett and Wautoma Bonds") in the aggregate principal amount of $4,380,000.00. The Gillett and Wautoma Issuer and the Trustee entered into an Indenture dated February 1,

-17-

1997, pursuant to which the Trustee has at all times acted as Indenture Trustee in connection with the Gillett and Wautoma Bonds (the "Gillett and Wautoma Indenture").

71.    The Gillett and Wautoma Issuer loaned the proceeds from the sale of the Gillett and Wautoma Bonds (the "Gillett and Wautoma Loan") to Malachi to finance Malachi's acquisition of the Gillett and Wautoma Facilities under the terms of a Loan Agreement between Malachi and the Gillett and Wautoma Issuer dated February 1, 1997 (the "Gillett and Wautoma Loan Agreement"). The Gillett and Wautoma Loan is evidenced by a promissory note dated February 1, 1997 executed by Malachi in favor of the Gillett and Wautoma Issuer, which the Gillett and Wautoma Issuer endorsed in favor of the Trustee (the "Gillett and Wautoma Note"). A true and correct copy of the Gillett and Wautoma Loan Agreement is attached hereto and incorporated herein as Exhibit BB. A true and correct copy of the Gillett and Wautoma Note is attached hereto and incorporated herein as Exhibit CC.

72.    Pursuant to the Gillett and Wautoma Indenture, as security for the indebtedness to the bondholders evidenced by the Gillett and Wautoma Bonds, the Gillett and Wautoma Issuer pledged and assigned to the Trustee, among other things: (i) all the Gillett and Wautoma Issuer's rights and interests under the Gillett and Wautoma Loan Agreement and the Gillett and Wautoma Note; (ii) all of the Gillett and Wautoma Issuer's rights and interests under the Gillett and Wautoma Mortgages, as defined below; (iii) all payments derived by the Gillett and Wautoma Issuer or the Trustee pursuant to the Gillettt and Wautoma Loan Agreement and the Gillett and Wautoma Note; and (iv) all moneys and securities held by the Trustee under the terms of the Gillett and Wautoma Indenture. A true and correct copy of the Gillett and Wautoma Indenture is attached hereto and incorporated herein as Exhibit DD.

-18-

73.    As further security for the Loan and its obligations under the Gillett and Wautoma Loan Agreement, Malachi delivered to the Gillett and Wautoma Issuer: (i) a certain Mortgage and Security Agreement dated February 1, 1997, (the "Gillett Mortgage") against the Gillett Facility, which was duly filed in the offices of the Oconto County Register of Deeds on February 19, 1997, and recorded at Volume 701, Page 611, the Gillett and Wautoma Issuer assigned the Gillett Mortgage to the Trustee by Assignment dated February 1, 1997, and recorded in the Oconto County Register of Deeds on February 19, 1997, and recorded at Volume 701, Page 638; and (ii) a certain Mortgage, Assignment of Rents, and Security Agreement dated February 1, 1997, (the "Wautoma Mortgage") against the Wautoma Facility, which was duly filed in the offices of the Waushana County Register of Deeds on February 19, 1997 and recorded at Volume 484, Page 708, the Gillett and Wautoma Issuer assigned the Wautoma Mortgage to the Trustee by Assignment dated February 1, 1997, and recorded in the Waushana County Register of Deeds on February 19, 1997 at Volume 484, Page 734. True and correct copies of the Gillett Mortgage and the Wautoma Mortgage (the "Gillett and Wautoma Mortgages") are collectively attached hereto and incorporated herein as Exhibit EE.

74.    Pursuant to the Gillett and Wautoma Mortgages, Malachi granted the Gillett and Wautoma Issuer a security interest in: (i) the Gillett and Wautoma Facilities (the real property and all buildings, fixtures, and improvements thereon); (ii) all tangible personal property which is part of the Gillett and Wautoma Facilities; (iii) all contracts, chattels, receivables, general intangibles, inventory, equipment and records related to the Gillett and Wautoma Facilities; (iv) all certificates of need, licenses, permits, and approvals; (v) all proceeds; and (vi) all leases and rentals from the Gillett and Wautoma Facilities.

75.    Pursuant to Sections 5.01 of the Gillett and Wautoma Mortgages, Malachi assigned to the Trustee all leases, rents, issues and profits from the Gillett and Wautoma Facilities.

76.    Malachi executed a UCC Financing Statement in favor of the Trustee evidencing the Trustee's security interest in Malachi's assets relating to the Gillett and Wautoma Facilities (the "Gillett and Wautoma Financing Statement").  A true and correct copy of the Gillett and Wautoma Financing Statement is attached hereto and incorporated herein as Exhibit FF.

## COUNT I: BREACH OF CONTRACT UNDER THE REDFORD ISSUE

77.    The Trustee realleges the allegations of paragraphs 1-76.

78.    Malachi is in default to the Trustee pursuant to the terms of, *inter alia*, the Redford Mortgage due to, *inter alia*, Malachi's

a.    failure to make payments when they were due under the Redford Loan Agreement;

b.    failure to comply with certain covenants, terms and conditions of the Redford Mortgage, including, but not limited to, failure to pay all lawful taxes, assessments and charges upon the Redford Facility; and

c.    failure to enforce the Management agreement with the Manager, which requires, among other things, (i) the payment of lawful taxes, assessments and charges upon the Redford Facility, and (ii)

-20-

subordination of any management fees to the Manager to the timely

payment of debt service.

79.     Pursuant to paragraph 2.01 of the Redford Mortgage, the defaults of

Malachi as described in the preceding paragraph constitute events of default which entitle the

Trustee to exercise its remedies under, *inter alia*, the Redford Mortgage and under applicable

law.

80.     Pursuant to paragraph 2.01, upon the occurrence of an event of default, the

Trustee may, at its election, among other things, take steps to enforce its rights whether by action,

suit or proceeding in equity or at law for specific performance of any covenant, condition, or

agreement, and apply on motion to any court of competent jurisdiction for the appointment of a

receiver to take charge of, manage, preserve, protect, and operate the Redford Facility.

81.     The amount of principal, accrued and unpaid interest and late fees which

Malachi owes to the Trustee under the Redford Mortgage is approximately $6,618,608.00 as of

February 28, 1999. Malachi is liable for the immediate payment of this amount to the Trustee,

together with, among other things, accrued interest and interest which will accrue, plus fees,

costs and expenses incurred and to be incurred by the Trustee in the collection thereof, including,

without limitation, actual attorneys' fees and legal expenses.

WHEREFORE the Trustee prays that this Court enter an Order which:

A.     determines the amount due to the Trustee from Malachi pursuant to the

Redford Mortgage;

-21-

B.      orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records relating to the Facilities;

C.      orders the appointment of a receiver to take charge of, manage, preserve, protect, and operate the Redford Facility, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Redford Facility, and, after the payment of expenses of the receivership and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D.      awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E.      grants such other relief as the Court deems equitable and just.

## COUNT II: BREACH OF CONTRACT UNDER THE RIVERVIEW ISSUE

82.     The Trustee realleges the allegations of paragraphs 1-81.

83.     Malachi is in default to the Trustee pursuant to the terms of, *inter alia*, the Riverview Mortgage due to, *inter alia*, Malachi's

a.      failure to make payments when they were due under the Riverview Loan Agreement;

b.      failure to comply with certain covenants, terms and conditions of the Riverview Mortgage, including, but not limited to, failure to pay all lawful taxes, assessments and charges upon the Riverview Facility; and

-22-

       c.      failure to enforce the Management agreement with the Manager, which requires, among other things, (i) the payment of lawful taxes, assessments and charges upon the Riverview Facility, and (ii) subordination of any management fees to the Manager to the timely payment of debt service.

84.     Pursuant to paragraph 2.01 of the Riverview Mortgage, the defaults of Malachi as described in the preceding paragraph constitute events of default which entitle the Trustee to exercise its remedies under, *inter alia*, the Riverview Mortgage and under applicable law.

85.     Pursuant to paragraph 2.01, upon the occurrence of an event of default, the Trustee may, at its election, among other things, take steps to enforce its rights whether by action, suit or proceeding in equity or at law for specific performance of any covenant, condition or agreement, and apply on motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect and operate the Riverview Facility.

86.     The amount of principal, accrued and unpaid interest and late fees which Malachi owes to the Trustee under the Riverview Mortgage is approximately $3,962,950.00 as of February 28, 1999. Malachi is liable for the immediate payment of this amount to the Trustee, together with, among other things, accrued interest and interest which will accrue, plus fees, costs and expenses incurred and to be incurred by the Trustee in the collection thereof, including, without limitation, actual attorneys' fees and legal expenses.

WHEREFORE the Trustee prays that this Court enter an Order which:

A.    determines the amount due to the Trustee from Malachi pursuant to the Redford Mortgage;

B.    orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records related to the Facilities;

C.    orders the appointment of a receiver to take charge of, manage, preserve protect and operate the Riverview Facility, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Riverview Facility, and after the payment of expenses of the receivership, and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D.    awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E.    grants such other relief as the Court deems equitable and just.

## COUNT III: BREACH OF CONTRACT UNDER THE BANGOR ISSUE

87.    The Trustee realleges the allegations of paragraphs 1-86.

88.    Malachi is in default to the Trustee pursuant to the terms of, *inter alia*, the Bangor Mortgage due to, *inter alia*, Malachi's

a.    failure to make payments when they were due under the Bangor Loan Agreement;

b.    failure to comply with certain covenants, terms and conditions of the Bangor Mortgage, including, but not limited to, failure to pay

-24-

all lawful taxes, assessments and charges upon the Bangor Facility; and

c.    failure to enforce the Management agreement with the Manager, which requires, among other things, (i) the payment of lawful taxes, assessments and charges upon the Bangor Facility, and (ii) subordination of any management fees to the Manager to the timely payment of debt service.

89.    Pursuant to paragraph 2.01 of the Bangor Mortgage, the defaults of Malachi as described in the preceding paragraph constitute events of default which entitle the Trustee to exercise its remedies under, *inter alia*, the Bangor Mortgage and under applicable law.

90.    Pursuant to paragraph 2.01, upon the occurrence of an event of default, the Trustee may, at its election, among other things, take steps to enforce its rights whether by action, suit or proceeding in equity or at law for specific performance of any covenant, condition or agreement, and apply on motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect and operate the Bangor Facility.

91.    The amount of principal, accrued and unpaid interest and late fees which Malachi owes to the Trustee under the Bangor Mortgage is approximately $11,360,900.00 as of February 28, 1999. Malachi is liable for the immediate payment of this amount to the Trustee, together with, among other things, accrued interest and interest which will accrue, plus fees, costs and expenses incurred and to be incurred by the Trustee in the collection thereof, including, without limitation, actual attorneys' fees and legal expenses.

-25-

WHEREFORE the Trustee prays that this Court enter an Order which:

A. determines the amount due to the Trustee from Malachi pursuant to the Bangor Mortgage;

B. orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records related to the Facilities;

C. orders the appointment of a receiver to take charge of, manage, preserve protect and operate the Bangor Facility, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Bangor Facility, and after the payment of expenses of the receivership, and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D. awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E. grants such other relief as the Court deems equitable and just.

## COUNT IV: BREACH OF CONTRACT UNDER THE PRINCETON ISSUE

92. The Trustee realleges the allegations of paragraphs 1-91.

93. Malachi is in default to the Trustee pursuant to the terms of, *inter alia*, the Princeton Mortgage due to, *inter alia*, Malachi's

  a. failure to make payments when they were due under the Princeton Loan Agreement;

  b. failure to comply with certain covenants, terms and conditions of the Princeton Mortgage, including, but not limited to, failure to pay

-26-

all lawful taxes, assessments and charges upon the Princeton

Facility; and

c.    failure to enforce the Management agreement with the Manager,

which requires, among other things, (i) the payment of lawful

taxes, assessments and charges upon the Princeton Facility, and (ii)

subordination of any management fees to the Manager to the timely

payment of debt service.

94.    Pursuant to Section 7.6 of the Princeton Mortgage, the defaults of Malachi as described in the preceding paragraph constitute events of default which entitle the Trustee to exercise its remedies under, *inter alia*, the Princeton Mortgage and under applicable law.

95.    Pursuant to Section 7.6, upon the occurrence of an event of default, the Trustee may, at its election, among other things, take steps to enforce its rights whether by action, suit or proceeding in equity or at law for specific performance of any covenant, condition or agreement, and apply on motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect and operate the Princeton Facility.

96.    The amount of principal, accrued and unpaid interest and late fees which Malachi owes to the Trustee under the Princeton Mortgage is approximately $2,991,600.00 as of February 28, 1999. Malachi is liable for the immediate payment of this amount to the Trustee, together with, among other things, accrued interest and interest which will accrue, plus fees, sots and expenses incurred and to be incurred by the Trustee in the collection thereof, including, without limitation, actual attorneys' fees and legal expenses.

-27-

WHEREFORE the Trustee prays that this Court enter an Order which:

A.    determines the amount due to the Trustee from Malachi pursuant to the Princeton Mortgage;

B.    orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records related to the Facilities;

C.    orders the appointment of a receiver to take charge of, manage, preserve protect and operate the Princeton Facility, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Princeton Facility, and after the payment of expenses of the receivership, and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D.    awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E.    grants such other relief as the Court deems equitable and just.

## COUNT V: BREACH OF CONTRACT UNDER THE MANITOWOC ISSUE

97.    The Trustee realleges the allegations of paragraphs 1-96.

98.    Malachi is in default to the Trustee pursuant to the terms of, *inter alia*, the Manitowoc Mortgage due to, *inter alia*, Malachi's

a.    failure to make payments when they were due under the Manitowoc Loan Agreement;

b.    failure to comply with certain covenants, terms and conditions of the Manitowoc Mortgage, including, but not limited to, failure to

pay all lawful taxes, assessments and charges upon the Manitowoc Facility; and

c.    failure to enforce the Management agreement with the Manager, which requires, among other things, (i) the payment of lawful taxes, assessments and charges upon the Manitowoc Facility, and (ii) subordination of any management fees to the Manager to the timely payment of debt service.

99.    Pursuant to Section 7.6 of the Manitowoc Mortgage, the defaults of Malachi as described in the preceding paragraph constitute events of default which entitle the Trustee to exercise its remedies under, *inter alia*, the Manitowoc Mortgage and under applicable law.

100.    Pursuant to Section 7.6, upon the occurrence of an event of default, the Trustee may, at its election, among other things, take steps to enforce its rights whether by action, suit or proceeding in equity or at law for specific performance of any covenant, condition or agreement, and apply on motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect and operate the Princeton Facility.

101.    The amount of principal, accrued and unpaid interest and late fees which Malachi owes to the Trustee under the Manitowoc Mortgage is approximately $5,718,997.00 as of February 28, 1999. Malachi is liable for the immediate payment of this amount to the Trustee, together with, among other things, accrued interest and interest which will accrue, plus fees, sots and expenses incurred and to be incurred by the Trustee in the collection thereof, including, without limitation, actual attorneys' fees and legal expenses.

-29-

WHEREFORE the Trustee prays that this Court enter an Order which:

A.    determines the amount due to the Trustee from Malachi pursuant to the Manitowoc Mortgage;

B.    orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records related to the Facilities;

C.    orders the appointment of a receiver to take charge of, manage, preserve protect and operate the Manitowoc Facility, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Manitowoc Facility, and after the payment of expenses of the receivership, and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D.    awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E.    grants such other relief as the Court deems equitable and just.

## COUNT VI: BREACH OF CONTRACT
## UNDER THE GILLETT AND WAUTOMA ISSUE

102.    The Trustee realleges the allegations of paragraphs 1-101.

103.    Malachi is in default to the Trustee pursuant to the terms of, *inter alia,* the Gillett and Wautoma Mortgages due to, *inter alia,* Malachi's

a.    failure to make payments when they were due under the Gillett and Wautoma Loan Agreement;

-30-

b.    failure to comply with certain covenants, terms and conditions of the Gillett and Wautoma Mortgages, including, but not limited to, failure to pay all lawful taxes, assessments and charges upon the Gillett and Wautoma Facilities; and

c.    failure to enforce the Management agreements with the Manager, which requires, among other things, (i) the payment of lawful taxes, assessments and charges upon the Gillett and Wautoma Facilities, and (ii) subordination of any management fees to the Manager to the timely payment of debt service.

104.    Pursuant to Section 7.6 of the Gillett and Wautoma Mortgages, the defaults of Malachi as described in the preceding paragraph constitute events of default which entitle the Trustee to exercise its remedies under, *inter alia*, the Gillett and Wautoma Mortgages and under applicable law.

105.    Pursuant to Section 7.6, upon the occurrence of an event of default, the Trustee may, at its election, among other things, take steps to enforce its rights whether by action, suit or proceeding in equity or at law for specific performance of any covenant, condition or agreement, and apply on motion to any court of competent jurisdiction, for the appointment of a receiver to take charge of, manage, preserve, protect and operate the Gillett and Wautoma Facilities.

106.    The amount of principal, accrued and unpaid interest and late fees which Malachi owes to the Trustee under the Gillett and Wautoma Mortgages is approximately $4,574,000.00 as of February 28, 1999. Malachi is liable for the immediate payment of this

-31-

amount to the Trustee, together with, among other things, accrued interest and interest which will accrue, plus fees, sots and expenses incurred and to be incurred by the Trustee in the collection thereof, including, without limitation, actual attorneys' fees and legal expenses.

WHEREFORE the Trustee prays that this Court enter an Order which:

A.    determines the amount due to the Trustee from Malachi pursuant to the Gillett and Wautoma Mortgages;

B.    orders Malachi and its agents to refrain from damaging, destroying, concealing, disposing of, or further dissipating the value of the collateral, including the Facilities and records related to the Facilities;

C.    orders the appointment of a receiver to take charge of, manage, preserve protect and operate the Gillett and Wautoma Facilities, to collect the rents and issues therefrom, to pay real and personal property taxes and assessments against the Gillett and Wautoma Facilities, and after the payment of expenses of the receivership, and after compensation to the receiver, to apply the net proceeds derived therefrom to the amounts owed to the Trustee;

D.    awards the Trustee its costs, including reasonable attorney's fees incurred in pursuing this action; and

E.     grants such other relief as the Court deems equitable and just.

Respectfully submitted,

PEPPER HAMILTON LLP

BY:     *Kay Standridge Kress*

KAY STANDRIDGE KRESS (P39339)
TIFFANY L. METZ (P58010)
100 Renaissance Center, 36th Floor
Detroit, Michigan 48243-1157
Telephone:  (313) 259-7110
Facsimile:  (313) 259-7926

and

Patrick J. McLaughlin
Julie A. Tilton
Dorsey & Whitney L.L.P.
Pillsbury Center South
220 South Sixth Street
Minneapolis, MN 55402
(512) 340-2600

Attorneys for Plaintiff Norwest Bank
Wisconsin, National Association

DATED:  _3/23/99_

DT: #106185 v1 (29XL01!.WPD)